UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------- X
                        :

NINA PITTON,                   :
                        :

                Plaintiff,     :  **MEMORANDUM**
                        :  **<u>DECISION & ORDER</u>**
      - against -        :
                        :  15 Civ. 1235 (BMC)

NEW YORK CITY DEPARTMENT of  :
EDUCATION, et al.,        :
                        :

              Defendants.   :

-------------------------------------------------------- X

**COGAN,** District Judge.

      Plaintiff brought this action under Title VII, the New York State Human Rights Law, and

the New York City Human Rights Law, and 42 U.S.C. § 1983 for alleged discrimination and

retaliation.  The parties have stipulated to the dismissal of all but the § 1983 claims arising from

alleged retaliation against plaintiff for speech protected by the First Amendment.  Before me is

defendants' motion for summary judgment.  For the reasons set forth below, defendants' motion

is granted.

## BACKGROUND

      The following facts are viewed in the light most favorable to plaintiff and are undisputed.

Plaintiff began her employment with the New York City Department of Education ("DOE") as a

School Aide in 1989, after which she held several other positions at DOE, including

paraprofessional, special education teacher, Assistant Principal, and Education Administrator.

Plaintiff began working as an Assistant Superintendent/Network Leader ("Network Leader") for

District 75 in February 2012.  District 75 of DOE is comprised of schools throughout the five

1

boroughs serving special needs students. Plaintiff was interviewed for the Network Leader position by Gary Hecht, the Superintendent of District 75 ("Hecht"), Barbara Joseph, the Deputy Superintendent ("Joseph"), and Ketler Louissant, a District 75 Network Leader ("Louissant"). Hecht was plaintiff's immediate supervisor during her employment as a Network Leader.

As part of plaintiff's job responsibilities as a Network Leader, plaintiff worked with school principals and teachers of fifteen District 75 schools to help the schools align their practices to the DOE's Quality Review standards and increase student performance. At the time plaintiff was hired as a Network Leader in 2012, Network Leaders had begun to conduct Quality Reviews of the District 75 schools.[1]

A Quality Review ("QR") is an assessment of a school by an experienced educator who visits the school to review the school's performance in a variety of areas. The QR standards and guidelines are developed exclusively by the DOE, and QR contains approximately 60 performance criteria to be assessed by the reviewer.

The reviewer conducts several activities as part of the QR process, including meetings, classroom visits, data review, and information gathering. The reviewer then issues the school a QR score, which is incorporated into a school principal's annual review and is posted on the school's webpage and available to the public. At the time of the events alleged in the Amended Complaint, a formal QR typically took three days and was conducted by a Lead Reviewer, who would sometimes be accompanied by a supporting reviewer or by a mentor or shadow during training. A mentor is to assist a training reviewer in determining the QR score for a school by ensuring that the score was supported by the evidence gathered.

---

[1] The parties dispute whether or not performing Quality Reviews was a required job responsibility for Network Leaders, but there is no dispute that Network Leaders were conducting Quality Reviews at the time of the events alleged in the Amended Complaint.

Scores for each school are quality assured; when QRs are performed by DOE employees who do not work in the Office of School Quality, a Director from the Office of School Quality is responsible for providing feedback to reviewers and reviewing draft QRs. Reviewers would assign the school one of four QR final scores: underdeveloped, developing, proficient, and well-developed. QR training provides that a reviewer should "score down" for the exit meeting, which takes place with the principal of the school, so that the final QR score, assigned after all of the evidence has been collected, will not be lower than discussed at the exit meeting.

Plaintiff was assigned a mentor, Sheryl Watkins ("Watkins"), during her QR for the PS K753 School for Career Development ("SCD") from January 29 through February 1, 2013.[2] This was plaintiff's first QR as a Network Leader. Watkins had retired from DOE and was working as a consultant for the DOE's quality review team in early 2013. After plaintiff conducted the QR for SCD, she and Watkins disagreed as to what score should be assigned to the school; plaintiff believed the school deserved a "well-developed" score, while Watkins believed the school should be given a lower score. Plaintiff and Watkins compromised by deciding that plaintiff would tell the principal of SCD, Yvrose Pierre ("Principal Pierre"), during the exit meeting that the school would receive a QR score of "proficient." Plaintiff told Watkins she would change the QR score to well-developed when she wrote the QR report.

Teresa Caccavale ("Caccavale") was a Director of School Quality in DOE's Office of School Quality assigned to review plaintiff's draft QR report for SCD and provide feedback, such as the application of QR standards and corrections to grammar. Plaintiff sent Caccavale an email on January 31, 2013, prior to submitting her draft report for review, stating that SCD's QR

[2] Plaintiff's opposition notes that during her deposition, the Brooklyn Transition Center was identified as the actual school where plaintiff and Watkins had the dispute over the scores, and where plaintiff allegedly engaged in protected speech. The parties continue to refer to Brooklyn Transition Center as SCD in their 56.1 statements and motion papers and, for the sake of clarity and consistency, I will do the same.

score was "proficient"; in plaintiff's first draft of the report, however, she had changed SCD's QR score to "well-developed." Caccavale commented on page one of the draft report that the report read as a proficient report with some well-developed indicators. Plaintiff understood this to mean that Caccavale was insisting that the school's score be changed to proficient. In a subsequent meeting with Caccavale regarding plaintiff's second draft of the QR report for SCD, plaintiff provided additional evidence to support a well-developed rating. Plaintiff determined the QR final score.

Plaintiff was subsequently accompanied by Caccavale for a portion of a QR for another school, PS Q993, which took place in March 2013. Plaintiff and Caccavale disagreed about the appropriate score for this school, and plaintiff ultimately assigning the score she thought the school should receive, the higher score of the two. Plaintiff believed that her decision not to take Caccavale's advice made Caccavale "irate." Plaintiff was also accompanied on at least one other QR following the QR for PS Q993.

Plaintiff did not believe she needed additional training in performing QRs due to her past experience as an education administrator, and believed that her relationships with her supervisors, Hecht and Joseph, changed following the QR with Watkins. Plaintiff testified she believed this because a colleague told plaintiff she was "walking on eggs" with her supervisor after the QR at PS Q993 and her rejection of Caccavale's advice, and because (1) plaintiff began to get questions from principals regarding when she was visiting schools, (2) Joseph called a school to confirm that plaintiff was there and to ask when she was leaving, and (3) Hecht told plaintiff that three District 75 principals had complained to Hecht that they did not receive the professional support they needed from plaintiff as their Network leader.

In the Spring of 2013, after plaintiff was told of the complaints from the three principals about her performance as a Network Leader, Hecht and Joseph advised plaintiff to apply for another position as a senior instructional facilitator ("SATIF").  The SATIF position included supporting schools in the implementation of DOE initiatives and conducting QRs.  In May 2013, plaintiff applied for the District 75 SATIF position.

On June 14, 2013, Hecht sent plaintiff a letter notifying plaintiff of her termination and giving the reason for the termination.  Hecht noted the discussions with plaintiff in May and June regarding her job performance and the complaints received from other principals.  Hecht also wrote that he was informed by the Director of Autism that plaintiff had not met with her over the past year and stating this was "of particular concern" because, as plaintiff was told at the time she was hired for the Network Leader position in February 2012, plaintiff's Network serves the greatest number of students with autism in the system.  Lastly, Hecht wrote that he had previously discussed his concerns with plaintiff about her failure to arrive on time for scheduled school meetings.  Hecht stated that, after "reviewing [plaintiff's] job performance for the past school year 2012-2013 and [their] discussions at [their] meetings," plaintiff's performance was "unsatisfactory" and that her services would be terminated effective June 30, 2013.[3]

## DISCUSSION

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," Fed. R. Civ. P. 56(a), and when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party," Weintraub v. Bd. of Educ. of City Sch. Dist. of City of New York, 593 F.3d 196, 200 (2d Cir. 2010) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,

---

[3] Previously, plaintiff was told by Hecht and Joseph, presumably at the latter of the two meetings mentioned in Hecht's letter, that she would have until September 2014 to find another job at DOE.

475 U.S. 574, 106 S. Ct. 1348 (1986)).  On a motion for summary judgment, it is not for the court to weigh the evidence, assess the credibility of the witnesses, or resolve issues of fact, but only to determine whether there are issues to be tried.  United States v. Rem, 38 F.3d 634, 644 (2d Cir. 1994).

The record must be construed in the light most favorable to plaintiff, Mihalik v. Credit Agricole Cheuvreux N. Am., Inc., 715 F.3d 102 (2d Cir. 2013), but "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient" to defeat the motion.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252, 106 S. Ct. 2505 (1986).  Further, "conclusory statements, conjecture, and inadmissible evidence are insufficient to defeat summary judgment."  ITC Ltd. v. Punchgini, Inc., 482 F.3d 135, 151 (2d Cir. 2007).

Plaintiff alleges that defendant New York City Department of Education violated her First Amendment rights by retaliating against her for raising concern that Watkins' preferred quality review rating for a school was based on Watkins' discriminatory view of the school, due to its high concentration of African American and black students and faculty members.  To make out a *prima facie* case of First Amendment retaliation, a plaintiff must establish "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action."  Scott v. Coughlin, 344 F.3d 282, 287 (2d Cir. 2003) (quoting Morales v. Mackalm, 278 F.3d 126, 131 (2d Cir. 2002)).  Once a *prima facie* case of First Amendment retaliation has been made, the burden then shifts to the employer to show it would have taken exactly the same action absent the improper motive.  Id. at 288.

## I.      Protected Speech

Plaintiff must first establish that her speech or conduct as a public employee was protected by the First Amendment.  "The mere fact of government employment does not result in the evisceration of an employee's First Amendment rights, but public employment does substantially curtail the right to speak freely in a government workplace."  Singer v. Ferro, 711 F.3d 334, 339 (2d Cir. 2013).  When a citizen is employed by the government, the citizen by necessity must accept certain limitations on his First Amendment freedom to allow for the efficient provision of public services.  See Garcetti v. Ceballos, 547 U.S. 410, 126 S. Ct. 1951 (2006); Connick v. Myers, 461 U.S. 138, 103 S. Ct. 1684 (1983).  That said, the Supreme Court has made clear that the First Amendment protects a public employee's right, in certain circumstances, to "speak as a citizen addressing matters of public concern." Garcetti, 547 U.S. at 419 (citations omitted).  The inquiry into the protected status of speech is one of law, not fact. See Connick, 461 U.S. at 148 n. 7, 150 n. 10; Singer, 711 F.3d at 339.

The Second Circuit interprets the step one inquiry as encompassing two separate sub-questions: "(1) whether the subject of the employee's speech was a matter of public concern and (2) whether the employee spoke as a citizen rather than solely as an employee." Matthews v. City of New York, 779 F.3d 167, 172 (2d Cir. 2015) (quoting Jackler v. Byrne, 658 F.3d 225, 235 (2d Cir.2011)) (internal quotation marks omitted).

### a.  Plaintiff's Speech

At the outset, defendants dispute a threshold factual issue that I must address before determining whether the speech is protected – that is, whether plaintiff engaged in the alleged speech at all.  Plaintiff alleges that she was retaliated against for telling Watkins that Watkins'

preferred QR score for SCD was the result of Watkins' discriminatory view of the school due to its high concentration of African American and black students.

Plaintiff testified that, at the time of the QR review at SCD, she believed Watkins had based her preferred QR score on Watkins' discriminatory views of the school population, a conclusion she had reached due to the high population of African American and black students and staff at SCD, in conjunction with what she believed were Watkins' unsupported opinions about the performance of the staff.

Plaintiff's belief is not disputed, and I have no reason to question it. Whether Watkins had discriminatory views, however, is not the subject of this lawsuit. The relevant question is not whether Watkins' held discriminatory views, or even whether other individuals at SCD or DOE confronted Watkins about those views (though it may make plaintiff's version of events more credible).[4] The only question to resolve at this stage is whether there is a genuine dispute that plaintiff herself made any comment to Watkins about her discriminatory views.

Plaintiff herself did not testify at her deposition that she had made such a specific allegation to anyone. However, she argues on summary judgment that she engaged in such speech with both Watkins at the time of the QR at SCD, and later to Louissant. Plaintiff testified and submitted a declaration stating that she had asked Watkins whether Watkins' view of the school's proper rating was due to the "demographics" of the school:

Q: What was the reference that Ms. Watkins made to the student body?

A: Um, she said, um, this school will not be receiving a well-developed. They will not let me give that school a well-developed. And I asked her, is it

---

[4] Plaintiff testified that others believed Watkins had discriminatory views, and that "all hell broke loose" at SCD when the proficient QR score was told to Principal Pierre, who then accused Watkins of having discriminatory views. In addition to its irrelevance to plaintiff's speech, I need not consider plaintiff's testimony of others' statements about or experiences with Watkins, as plaintiff "cannot rely on inadmissible hearsay in opposing a motion for summary judgment . . . absent a showing that admissible evidence will be available at trial. [Plaintiff] has made no such showing." Burlington Coat Factory Warehouse Corp. v. Esprit De Corp., 769 F.2d 919, 924 (2d Cir. 1985). For the purposes of this decision, I have accepted as true hearsay evidence that the parties do not dispute.

because of the demographics of the school? And is it because of the principal? And she said, forget the, forget the well-developed. If you do, I will fight it. If you do give it a well-developed, I will fight it.

Q: Did she say why she did not think the school should get a well-developed?

A: Not in so many words, but it was implied.

Q: What was implied?

A: That she looked down on this particular school and principal, and that, um, she didn't think that the – it wasn't based on facts, basically. That's how I saw it. I saw that the, her willingness to give the school a low score was not, was not, um, based on facts.

***

Q: And when did you tell her that you thought her rating was a result of her discriminatory views?

A: Before that last meeting with the principal.
. . .
Q: . . . What exactly did you tell her, if you recall?

A: I said, why don't you like the school, and what did you, what did you based on your score on. And she said, well, she told me, and then – I'm not – I'm practically quoting, because I do remember she said the principal was a b—. And some – I don't remember exactly. I think I heard black b—, but I'm going to say b—.

Q: And how did you tell her that – how did you bring up that you thought her opinion was based on discriminatory [views]?

A: When she said that, I said, well, I don't understand. . . . And she said, No. She said, No, that this school doesn't deserve a well-developed.

When plaintiff was explicitly asked whether she had ever specifically mentioned race during her discussion with Watkins, plaintiff responded by repeating a version of events in which neither she nor Watkins mention race (similar to those excerpted above), implicitly acknowledging that she had not. Although plaintiff herself did not testify that she had specifically mentioned race, she asked Watkins whether her rating was based on the

9

"demographics" of the school, which could be reasonably interpreted to refer to racial

demographics. This is particularly true given the unlikelihood that plaintiff was referring to a

different type of demographic, such as age, gender, or socio-economic status. Construing all

ambiguities and drawing all reasonable inferences in plaintiff's favor, I think it's reasonable to

assume to conclude that plaintiff was referring to race.

The result is otherwise with regard to statements that plaintiff made to Louissant. During

plaintiff's deposition, when asked whether she told anyone at DOE that she thought Watkins'

rating for SCD was a result of her discriminatory views, plaintiff responded that she "may have"

and that she "probably discussed it only" with Louissant and that it would have been while she

was drafting the QR report. Plaintiff testified she did not have a specific memory of a discussion

with Louissant. This "vague" memory of a conversation with Louissant is nothing more of a

mere scintilla of evidence, if it is admissible at all, and, when coupled with plaintiff's initial

vacillation and lack of corroborating testimony, no reasonable jury could find that plaintiff

engaged in the alleged speech with Louissant.[5]  See Anderson, 477 U.S. at 252.

> **b.  *Speech Addressing Matters of Public Concern***

Having found that a reasonable jury could find that plaintiff did in fact question Watkins

about her discriminatory views, I now turn to whether that speech was protected by the First

Amendment as a matter of law. To find that plaintiff's speech was protected by the First

Amendment, plaintiff must have been speaking on a matter of public concern rather than

personal interests, and have done so as a private citizen rather than solely as part of her job

duties. See Garcetti, 547 U.S. at 420–22; Connick, 461 U.S. at 147; Matthews, 779 F.3d at 172.

---

[5] It doesn't appear that plaintiff relies on this conversation with Louissant outside of general references to plaintiff "questioning" Watkins' discriminatory views; such an allegation was not alleged in the Amended Complaint. In any case, even if a reasonable jury could find that plaintiff engaged in this speech with Louissant, there is no evidence to meet step three, that is, there is no evidence to show a causal connection between the plaintiff's speech with Louissant and plaintiff's termination.

A public employee's speech is on a matter of public concern where it "relates to 'any matter of political, social, or other concern to the community.'" Johnson v. Ganim, 342 F.3d 105, 112 (2d Cir. 2003) (quoting Connick, 461 U.S. at 146)). "Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." Connick, 461 U.S. at 147–48. Motive is not dispositive. Although an employee who complains solely about his own dissatisfaction with the conditions of his own employment is speaking "upon matters only of personal interest," id., an employee may speak on matters of public concern even while being motivated by a personal grievance, Sousa v. Roque, 578 F.3d 164, 174 (2d Cir. 2009). A court should be careful not to presume that all matters which transpire within a government office are of public concern; to do so would mean that "virtually every remark – and certainly every criticism directed at a public official – would plant the seed of a constitutional case." Connick, 461 U.S. at 149.

Plaintiff argues that her speech was on the matter of racism, and therefore a public concern. This construction is too expansive – the mere fact that a public employee's comments "could be construed broadly to implicate matters of public concern does not alter the general nature of her statements." Ezekwo v. New York City Health & Hosps. Corp., 940 F.2d 775, 781 (2d Cir. 1991). Nearly anyone complaining in the course of their employment could broaden the subject of their speech such that it touches on a matter of public concern. Plaintiff goes further, however, to explain that the speech "questioned whether Watkins' discriminatory and racist views tainted the quality review process of the SCD" and addressed a "broader public purpose" of whether the QR process and score was "negatively impacted because of racial discrimination."

Defendants argue that plaintiff's speech was limited to the execution of plaintiff's job responsibilities, specifically plaintiff's and Watkins' disagreement over a professional opinion

regarding the application of DOE's methodology to arrive at a QR score. Defendants assert that plaintiff's speech was an expression of "a personal disagreement involving the application of DOE procedures." Such a construction is too narrow and ignores the racial element of plaintiff's speech altogether.

First, even if plaintiff was concerned with the DOE procedures or her treatment for using those QR standards to a result contrary to her mentor, that motivation does not itself preclude plaintiff from having spoken on a matter of public concern. As the Supreme Court in Connick made clear, even if personal opposition to an employer's policy motivates an employee to speak, the resulting speech may nonetheless be a matter of public concern. Connick v. Myers, 461 U.S. at 138, 149; see also Sousa v. Roque, 578 F.3d 164, 170 (2d Cir. 2009) (noting that motivation was not dispositive to the Connick Court's holding that one question is a matter of public concern).

Second, defendants' reliance on Adams v. Ellis, No. 09 Civ. 1329, 2012 U.S. Dist. LEXIS 29621, 2012 WL 693568 (S.D.N.Y. Mar. 2, 2012), aff'd, 536 F. App'x 144 (2d Cir. 2013), offers them no support. See. In that case, the plaintiff allegedly suffered adverse employment actions for engaging in various instances of protected speech, including participating in a union rally that protested certain labor practices being employed by defendants, and speaking at a hearing held in the State Assembly about the policies and practices of defendants. The court determined that the plaintiff's speech was not protected by the First Amendment because it did not go beyond the her dissatisfaction with the policies governing her employment; even evidence of the plaintiff's speech at a hearing sponsored by the State Assembly gave "no hint of concern with any of the subjects that are traditional matters of public

concern, like discrimination, political patronage, corruption, or even crime rates, staffing, budgets, or equipment shortages." Id., 2012 WL 693568, at *11 (internal citations omitted).

Unlike the plaintiff in Adams, plaintiff here was concerned with a traditional matter of public concern, not merely with the policies governing her employment. Plaintiff did not take issue with the methods and procedures employed by DOE in conducting QRs, or in how a QR score is reached as a matter of policy. Quite the contrary – plaintiff believed that employing DOE procedures correctly would lead to a different QR score for SCD, if not for Watkins' discriminatory views due to the African American and black population of the school. Plaintiff was concerned with how the QR score for SCD would be affected by a reviewer's racially discriminatory views, where that QR score was used in a principal's performance review, and made available to the public on the school's webpage.[6] That discrimination on the basis of race would negatively impact the publicly viewed quality score for the school is a matter of public concern, and plaintiff's speech therefore meets the first sub-step in that she engaged in protected speech.

> c. *Speaking as a Private Citizen versus Public Employee*

Even though plaintiff spoke on a matter of public concern, her speech is ultimately not protected by the First Amendment because plaintiff spoke in her capacity as a public employee, and not as a private citizen. When a public employee makes a statement pursuant to her official duties, the employee is not speaking as a citizen for First Amendment purposes, and the Constitution does not insulate her communications from employer discipline. Garcetti, 547 U.S. at 421. Speech is made pursuant to a public employee's job duties where the speech "owes its

---

[6] Although the parties dispute what purpose was served by displaying the QR score on the public webpage, it is reasonable to conclude that the public could consider these scores in determining whether to transfer their children to another school under New York City's Public School Choice program, as advanced by plaintiff and mentioned by Yaffe during her deposition.

existence to a public employee's professional responsibilities." Id. at 421. This is the case even when the subject of an employee's speech is a matter of public concern. Ross v. Breslin, 693 F.3d 300 (2d Cir. 2012).

The inquiry into whether a public employee is speaking as a private citizen is a practical one, Garcetti, 547 U. S. at 424, and is "not susceptible to a brightline rule." Ross v. Breslin, 693 F.3d at 306. "Courts must examine the nature of the plaintiff's job responsibilities, the nature of the speech, and the relationship between the two." Id.

In making that inquiry here, the Second Circuit's decision in Weintraub offers guidance. There, the plaintiff schoolteacher alleged he was retaliated against because of a grievance he filed with the union concerning the discipline of a student. The plaintiff had referred the student twice to his supervisor for throwing books at the plaintiff, but no disciplinary action was taken; after the plaintiff learned the student had previously injured another student, plaintiff filed a formal grievance with the union. The Second Circuit joined other Circuits in concluding "speech can be 'pursuant to' a public employee's official job duties even though it is not required by, or included in, the employee's job description, or in response to a request by the employer." 593 F.3d at 203. The Second Circuit reasoned that plaintiff's speech was not protected because the speech "was part-and-parcel of his concerns about his ability to properly execute his duties" – namely, his duty to maintain classroom discipline, which it found to be "an indispensable prerequisite to effective teaching and classroom learning." Id.

Drawing on the Supreme Court's decision in Garcetti, the Second Circuit further supported its holding that the plaintiff spoke as a public employee because the plaintiff's speech, which ultimately took the form of an employee grievance, had no relevant citizen analogue. The Court found that the "lodging of a union grievance was not a form or channel of discourse

available to non-employee citizens, as would be a letter to the editor or a complaint to an elected representative or inspector general." Id.

In this case, plaintiff's speech was pursuant to her duties as a Network Leader. Plaintiff's duties included conducting QRs and making a final determination about a school's QR score in her report. In making her determination about SCD, plaintiff spoke to Watkins, her mentor, about the evidence supporting a proficient versus well-developed QR score. Although her speech was a matter of public concern, it was part-and-parcel to her concern about her ability to properly execute her duties – namely, her ability to determine the proper QR score for SCD based on the evidence before her, her knowledge of the DOE procedures, and guidance from her mentor. Rooting out the reasons behind her mentor's preferred QR score was an "indispensable prerequisite" to effective quality reviews. Furthermore, plaintiff's discussion with Watkins, which took place before the two met with the school's principal, before the conclusion of the school visit, and before the final score was ultimately determined (and before, accordingly, that score was made available to the public), does not have a private citizen analogue.[7]

The Second Circuit's decision in Matthews, upon which plaintiff relies, is not to the contrary. There,, the Circuit found that a police officer's complaints about the quota system was policy-oriented speech that was neither part of his job description nor part of the practical reality of his everyday work. Because his actual, functional job responsibilities did not include reporting his opinions on precinct-wide quota systems to the Precinct commanders, the plaintiff in Matthews was acting as a private citizen by choosing a "path that was available to ordinary

---

[7] Plaintiff submits in her motion papers that private citizens, i.e. parents of students at the school, "participated in the quality review" and therefore any parent could have made a similar statement about Watkins. There is no evidence in the record to support this statement and, even if it were true that they would participate somehow in the QR, this participation is not a civilian analogue to plaintiff's channel of speech. Plaintiff was responsible for determining the score of the school, and discussing all collected information with other DOE employees, which is obviously not an avenue parents have available.

citizens who are regularly provided the opportunity to raise issues with the Precinct commanders." 779 F.3d at 176.

Plaintiff asserts that, similar to Matthews, she was not required by virtue of her job description or her everyday work as a Network Leader to root out racial discrimination in the quality review process. Plaintiff's functional job responsibilities, however, did include her discussions with her mentor regarding QR scores and, as such, plaintiff's speech owed its existence to her functional responsibilities as Network Leader. The parties dispute whether the plaintiff was required to conduct quality reviews as part of her job duties. That distinction is not determinative here, as plaintiff herself concedes that Network Leaders had begun to conduct QRs at the time of the events in plaintiff's complaint and that plaintiff was responsible for reviewing and reporting the results of the QR for SCD. Indeed, plaintiff testified that she was trained, and allegedly over-trained, to conduct QRs during that period, because she was "scheduled to conduct quality reviews." Because plaintiff spoke about an issue directly related to her functional job duties and took an avenue available to her as a Network Leader, and not available to the public, plaintiff's speech is distinguishable from that in Matthews.

The First Amendment does not protect plaintiff's speech, and defendants' motion for summary judgment on plaintiff's retaliation claim is granted.

## II.    Causal Relationship

Even had I found that plaintiff had engaged in protected speech under the First Amendment, summary judgment would nonetheless be appropriate because plaintiff cannot establish a causal relationship between her speech and the adverse employment action.

To establish causation, a plaintiff must show that the protected speech "was a substantial motivating factor in the adverse employment action." Cioffi v. Averill Park Cent. Sch. Dist. Bd.

16

of Ed., 444 F.3d 158, 167 (2d Cir. 2006) (quoting Morris v. Lindau, 196 F.3d 102, 110 (2d Cir. 1999)).  In addition to direct evidence of retaliatory animus, a plaintiff may establish causation indirectly by showing her speech was followed closely in time by the adverse employment action.  Id. (citing Gorman–Bakos v. Cornell Coop. Extension, 252 F.3d 545 (2d Cir. 2001)).  There is "[n]o bright line" beyond which a temporal relationship is too attenuated to establish a causal relationship between the protected speech and the adverse employment action.  See Gorman-Bakos, 252 F.3d at 554.  Regardless of whether plaintiff presents direct or indirect evidence of causation, plaintiff bears the "initial burden of showing that an improper motive played a substantial part in defendant's action." Anemone v. Metro. Transp. Auth., 629 F.3d 97, 114 (2d Cir. 2011) (quoting Scott v. Coughlin, 344 F.3d 282, 288 (2d Cir. 2003)).

Simply put, plaintiff offers no admissible evidence to support her allegation that her termination was substantially motivated by retaliatory animus, directly or indirectly.  First, although there is no bright line rule for causation, plaintiff cannot meet her burden of showing a nexus between her speech and her termination by temporal proximity alone, as nearly five months had passed between plaintiff's conversation with Watkins around February 1, 2013 and when plaintiff was informed of her termination on June 14, 2013.  No reasonable jury could conclude that, on this basis alone, plaintiff was terminated in June as a result of her speech in February.

Plaintiff attempts to establish causation in part by presenting evidence that she suffered various adverse employment actions, including being shadowed for additional QRs.  It is undisputed that plaintiff was shadowed for additional QRs and attended meetings about her performance as a reviewer.  It is also clear that there was some tension between plaintiff and her supervisors, though the extent and details of that discord is disputed. (A reasonable jury could

conclude that these actions were "adverse" and therefore the dispute over what constitutes an adverse employment action is resolved in plaintiff's favor.) But just as timing alone is not sufficient to prove causation, neither is the mere existence of adverse actions. Assuming that further shadowing or training is an adverse employment action, there is still nothing – not even, in this case, a short temporal proximity – that would tend to indicate that these actions were taken as retaliation. Presenting evidence of suffering an adverse employment action on the one hand, and evidence of engaging in protected speech on the other, does not reasonably lead to the conclusions that the speech was the substantial motivating factor for the adverse employment action. Plaintiff has not presented evidence to show the relationship between the adverse employment actions and her speech is such that it would be reasonable to conclude that an improper motive played a substantial part in defendant's action. See Anemone, 629 F.3d at 114.

The unfavorable evidence in the record further undermines plaintiff's claim. Plaintiff's proffer of evidence in opposition to this basis for summary judgment comes in the form of her own deposition testimony.[8] Plaintiff's testimony reveals how attenuated plaintiff's theory of causation is, and how many unreasonable inferences a jury must make in order to find causation under these circumstances. Plaintiff's testimony makes clear that the most plaintiff allegedly said about racial discrimination when she questioned Watkins about whether her score for SCD was due to the demographics of the school. A jury must not only conclude that plaintiff meant "racial demographics," but infer – based on little to no evidence in the record – that Watkins understood plaintiff to mean "racial demographics" and was accusing her of racial

---

[8] Insofar as plaintiff relies on the deposition of Principal Pierre, who stated that she was uncomfortable being involved in the litigation because she "still work[ed] for the district" and had to "face those . . . people," that evidence is unavailing. Plaintiff asserts that Principal Pierre stated she was "taking heat" for being involved in plaintiff's case, but the record shows the contrary. When Principal Pierre was asked from whom she was taking heat, she responded, "I never said I was taking heat." Plaintiff relies on her testimony, which is in conflict with Principal Pierre's testimony, on this point as well.

discrimination. Watkins testified she did not recall any such accusation. Upon inferring that plaintiff and Watkins both understood what plaintiff was insinuating, a reasonable jury must then conclude that Caccavale, Yaffe, and Hecht each somehow became aware of plaintiff's speech and took various adverse employment actions (however defined) against plaintiff as a result of that conversation between plaintiff and Watkins.

Plaintiff stated during her deposition that she did not discuss her statement about Watkins' discriminatory views with Caccavale; nor did plaintiff testify that anyone discussed plaintiff's allegedly protected speech at any time before her termination. Plaintiff testified that, after seeing Watkins and Caccavale talking at a training meeting together, the two must have discussed the QR for SCD; plaintiff stated that she did not know what they said, only that "[Watkins] was a mentor" and "she had to have talked to them to report how the review went." Plaintiff offers no evidence that the Watkins had discussed plaintiff's statement regarding Watkins' allegedly discriminatory views with anyone. Watkins and Yaffe each testified that they were not aware of plaintiff's accusations against Watkins until this lawsuit was filed. Hecht and Caccavale each testified that no one, including plaintiff, ever told them that Watkins had based a QR rating on her discriminatory views.

All plaintiff offers by way of evidence is that she believed the further shadowing during QRs was the result of her statement about Watkins' discriminatory view because "that's when all [her] worries started" and it "became a nightmare." (Plaintiff also testified that she had a conversation with Joseph after plaintiff was scheduled to be shadowed for the third or fourth review, who told her that she and Hecht met with Yaffe and Caccavale, and another DOE employee named Elif Gure, and that, based on that conversation, plaintiff would receive additional training. This evidence is inadmissible, and it does no more for plaintiff's case than

her non-hearsay statements.  Plaintiff does not know whether Watkins was present for this meeting, and plaintiff did not suggest that her statement to Watkins was ever mentioned at the meeting.)  The evidence in the record does not support plaintiff's belief that adverse employment actions were taken as a result of one statement plaintiff made to Watkins earlier that year. Plaintiff cannot offer any non-conclusory evidence that defendants became aware of plaintiff's accusation at all, much less that it was a substantial motivating factor in taking adverse employment actions.  See ITC Ltd., 482 F.3d at 151.

Further, the termination letter tends to show that plaintiff's termination was due to her job performance, and plaintiff offers no non-conclusory evidence that this was not the case.  "[E]ven if there is evidence that the adverse employment action was motivated in part by protected speech, the government can avoid liability if it can show that it would have taken the same adverse action in the absence of the protected speech." Anemone, 629 F.3d at 114 (citing Heil v. Santoro, 147 F.3d 103, 109 (2d Cir. 1998)).  Such evidence, along with the defendants' testimony, tends to show that any alleged adverse employment actions up to the point of plaintiff's termination were due to performance-related issues, and not the result of retaliatory animus.  "[P]rotected speech could not substantially cause an adverse action if the employer would have taken that action in any event." Smith v. Cty. of Suffolk, 776 F.3d 114, 119 (2d Cir. 2015) (quoting Nagle v. Marron, 663 F.3d 100, 111 (2d Cir.2011)).  Plaintiff has not met her initial burden to show that her statements to Watkins were a substantial motivating factor for any adverse employment actions and, even if she had, she has offered no evidence to undermine defendants' evidence that they would have taken such actions in the absence of plaintiff's speech.

A reasonable jury could not take the facts as plaintiff presents them here and jump to the conclusion that plaintiff's statement to Watkins regarding her allegedly discriminatory views was a substantial motivating factor for taking adverse employment actions. Plaintiff may not rely on conclusory assertions of retaliatory motive to satisfy the causation prong of her retaliation claim, and plaintiff has not produced any "tangible proof to demonstrate that [her] version of what occurred was not imaginary." Cobb v. Pozzi, 363 F.3d 89, 108 (2d Cir. 2004). Plaintiff's § 1983 claim can therefore be dismissed in its entirety on this alternative basis.

## III.    **Monell Claim**

Finally, because plaintiff has not made a *prima facie* case of First Amendment retaliation, I need not reach the merits of plaintiff's Monell claim against the City of New York, and that claim is also dismissed. See Segal v. City of New York, 459 F.3d 207, 219 (2d Cir. 2006); see also Johnson v. City of New York, 551 F. App'x 14 (2d Cir. 2014).

## CONCLUSION

Defendants' [12] motion for summary judgment is granted. The Clerk is directed to enter judgment dismissing the complaint.

**SO ORDERED.**

_____
                              U.S.D.J.

Dated: Brooklyn, New York
          December 1, 2015

21